# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **MARGARET H. McKINNEY,** ) | | |
| Plaintiff ) | | |
| ) | | |
| v. ) | Civil Action No. 1:06cv00012 | |
| ) | **MEMORANDUM OPINION** | |
| ) | | |
| ) | | |
| **JO ANNE B. BARNHART**, ) | | |
| **Commissioner of Social Security,** ) | By: PAMELA MEADE SARGENT | |
| Defendant ) | United States Magistrate Judge | |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, Margaret H. McKinney, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

-1-

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McKinney filed her applications for DIB and SSI on or about April 13, 2003, alleging disability as of March 1, 2003,[1] based on epilepsy, tremors and anxiety. (Record, ("R."), at 52-54, 59, 311-14.) The claims were denied initially and upon reconsideration. (R. at 35-37, 40, 42-44, 316-18, 322-24.) McKinney then requested a hearing before an administrative law judge, ("ALJ"). (R. at 45.) The ALJ held a hearing on November 22, 2004, at which McKinney was represented by counsel. (R. at 331-47.)

By decision dated January 11, 2005, the ALJ denied McKinney's claim. (R. at 19-27.) The ALJ found that McKinney met the nondisability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 26.) The ALJ found that McKinney had not engaged in substantial gainful activity since March 1, 2003. (R. at 26.) The ALJ also found that the medical evidence established that McKinney suffered from severe impairments, namely a seizure disorder and bilateral hand tremor, but he found that McKinney did not have an impairment or

---

[1]McKinney amended her onset date from January 1, 2001, to March 1, 2003. (R. at 344.)

combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23-24, 26.) The ALJ found that McKinney's allegations were not totally credible. (R. at 26.) The ALJ found that McKinney retained the residual functional capacity for light work,[2] which did not require hazardous work around dangerous machinery and unprotected heights. (R. at 26.) The ALJ found that McKinney's impairments would not prevent her from performing her past relevant work as a video store cashier. (R. at 26.) Thus, the ALJ found that McKinney was not disabled under the Act and was not eligible for DIB or SSI benefits. (R. 26-27.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006).

After the ALJ issued his decision, McKinney pursued her administrative appeals, (R. at 14), but the Appeals Council denied her request for review. (R. at 8-11.) McKinney then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before the court on McKinney's motion for summary judgment filed July 17, 2006, and on the Commissioner's motion for summary judgment filed August 21, 2006.

## II. Facts

McKinney was born in 1965, (R. at 52, 334), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). McKinney has a high school education and two years of college education, and she has past work experience as a

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with lifting or carrying of items weighing up to 10 pounds frequently. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

video store clerk and a retail clerk. (R. at 60, 65, 334.)

McKinney testified that she was working at Blockbuster Video as a clerk, and that she worked about 20 hours or less per week. (R. at 334.) McKinney testified that she could not go back to her previous work because it was hard for her to struggle every day. (R. at 336.) McKinney testified that she could not write or type because of her hand tremor. (R. at 336.) McKinney testified that her seizure disorder was controlled by medication. (R. at 337.) McKinney testified that she had to get extra help at work because of her tremor. (R. at 340.) McKinney also testified that she had problems with her hand, arm and leg strength, and that she had problems balancing. (R. at 340.)

Donna Bardsley, a vocational expert, also was present and testified at McKinney's hearing. (R. at 344-46.) Bardsley classified McKinney's past work as a clerk or cashier as light and unskilled. (R. at 344.) Bardsley was asked to consider a hypothetical individual of McKinney's height, weight, education and work background who was able to perform light work, who must avoid hazardous work around dangerous machinery and unprotected heights and who had a biological tremor in her hands. (R. at 344-45.) Bardsley testified that there would be several jobs that such an individual could perform, including a sales clerk, an information clerk, an order clerk, a cashier, a ticket seller, a cafeteria attendant and a hand packager. (R. at 345.) Bardsley testified that these jobs existed in significant numbers in the region. (R. at 345.) Bardsley also testified that if the individual had greater than moderate restrictions due to an emotional disorder or if she was unable to tolerate an eight-hour workday, then she could not do these jobs. (R. at 345-46.) Bardsley also testified that

-4-

if the individual had severe limitation in sustained handling and fingering, then there would be no jobs available. (R. at 346.)

In rendering his decision, the ALJ reviewed records from Dr. Michael A. Sisk, M.D., a neurologist; Dr. Jonathan T. Swank, M.D.; Johnston Memorial Hospital; Food City Pharmacy; Abingdon OB/GYN; Dr. Chris Newell, M.D.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Albertine de Wit, M.D., a rheumatologist; Dr. Donald R. Williams, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; and Dr. Michael Swank, M.D.

The record shows that Dr. Michael A. Sisk, M.D., a neurologist, treated McKinney for a seizure disorder beginning in 1980. (R. at 141.) On March 6, 2002, Dr. Sisk saw McKinney, at his insistence, for the first time in two years. (R. at 146.) Dr. Sisk reported that McKinney's obesity remained rather extreme at around 250 pounds, and he believed that McKinney was doing little to improve her weight. (R. at 146.) Dr. Sisk noted McKinney's general health to be good, and he noted nothing that suggested that seizures had occurred in years. (R. at 146.) He reported that except for obesity, McKinney basically looked fine. (R. at 146.) He noted that McKinney had a moderate tremor of her extended hands which went away with activity. (R. at 146.) Dr. Sisk reported that McKinney did not have any Parkinsonian symptoms, increased tone or slowness of movement. (R. at 146.)

On June 23, 2003, Dr. Sisk saw McKinney for the first time since March 2002, basically under the threat that he could no longer be responsible for her medications. (R. at 143-45.) McKinney reported that she had difficulty with short-term memory

since her episode with toxic shock syndrome. (R. at 143.) McKinney reported that she worked between 15 and 20 hours a week. (R. at 143.) McKinney complained of many nonneurological problems, which Dr. Sisk noted were not surprising given McKinney's severe obesity of 278 pounds. (R. at 144.) Dr. Sisk reported that McKinney's neurological examination was normal, except for a significant resting tremor in both hands and forearms. (R. at 145.)

On September 25, 2003, Dr. Sisk issued a medical statement summarizing his treatment of McKinney and her medical condition. (R. at 141-42.) Dr. Sisk reported that McKinney's seizure disorder had been controlled. (R. at 141.) He also reported that McKinney had a chronic problem with headaches. (R. at 141.) Dr. Sisk opined that McKinney had a disabling medical condition that rendered her unable to sustain employment. (R. at 141.) On August 31, 2004, Dr. Sisk saw McKinney for the first time in more than a year, and noted that McKinney's tremor had gotten worse. (R. at 304-05.) Dr. Sisk also noted that McKinney had trouble balancing, which was impeded by her obesity. (R. at 304.) McKinney reported not having anything consistent with seizures, although she did complain of tension headaches, which were relieved with over-the-counter medication. (R. at 305.)

On June 24, 2005, Dr. Sisk issued a statement opining that McKinney met all qualifications for a full medical disability. (R. at 330.) Dr. Sisk issued a medical statement indicating that McKinney was required to get nine hours of sleep per night and that she must not work past 10:00 p.m. (R. at 329.) He reported that if McKinney did work past 10:00 p.m., she should not work the following day until the afternoon. (R. at 329.) On April 14, 2005, Dr. Sisk indicated that McKinney's brain MRI

-6-

performed in March 2005 was completely normal. (R. at 327.)

On May 11, 1997, McKinney was admitted to Johnston Memorial Hospital for complaints of shortness of breath and generalized myalgias and arthralgias. (R. at 250-65.) Dr. Emory H. Robinette, M.D., diagnosed probable toxic shock syndrome with associated sepsis and hypotension, hepatic necrosis possibly due to hypotension, metabolic acidosis, a history of chronic seizure disorder, a history of osteomyelitis in the distant past and a history of recent dental abscess. (R. at 253.) McKinney was listed in guarded condition and transferred to the University of Virginia Hospital by air transport on May 12, 1997.[3] (R. at 253.) On September 15, 1998, McKinney presented to the emergency room at Johnston Memorial Hospital, reporting that she fell at her home following a seizure. (R. at 283.) McKinney was treated and discharged that same day. (R. at 283.) On August 24, 2003, McKinney presented to the emergency room and was diagnosed with generalized joint aches and mixed connective tissue disease disorder. (R. at 181-84.) On October 16, 2003, McKinney presented to the emergency room for complaints of chest and back pain. (R. at 163-72.) Chest x-rays were normal. (R. at 166.) McKinney was diagnosed with shoulder pain. (R. at 165.)

On July 8, 2003, McKinney saw Dr. Jonathan T. Swank, M.D., for complaints of problems with diffuse arthralgias, myalgias and occasional headaches. (R. at 153-54.) McKinney reported that her seizure disorder was controlled with medications. (R. at 153.) Dr. Swank diagnosed diffuse myalgias and arthralgias, seizure disorder,

---

[3]The record does not contain any medical evidence from the University of Virginia Hospital.

tremors and headaches postprandial, possibly secondary to hyperglycemia. (R. at 153.) On July 15, 2003, Dr. Swank reviewed McKinney's lab results, which were normal except for a positive antinuclear antibody test. (R. at 152.) Dr. Swank diagnosed diffuse arthralgias with positive antinuclear antibody of unclear significance and seizure disorder. (R. at 152.) On August 5, 2003, McKinney complained of problems with her hands, and Dr. Swank opined that McKinney probably had mixed connective tissue disorder and prescribed Celebrex. (R. at 150.) On August 19, 2003, McKinney complained of pain in her hands and arms and reported that the Celebrex was not working. (R. at 149.) Dr. Swank diagnosed mixed connective tissue disorder with symptoms of arthralgias and prescribed Salsalate. (R. at 149.) On August 26, 2003, McKinney reported widespread pain and fatigue, and Dr. Swank recommended a rheumatology referral and a sleep study. (R. at 148.) Dr. Swank diagnosed McKinney with widespread pain and mixed connective tissue disorder. (R. at 148.) On September 3, 2003, McKinney reported that she was doing better since starting her medication. (R. at 147.)

On August 28, 2003, Dr. Chris Newell, M.D., saw McKinney at the request of Disability Determination Services for complaints of arthralgias with positive antinuclear antibody and possibly a drug-induced type lupus syndrome. (R. at 185-89.) McKinney reported that her seizure disorder was controlled with medication. (R. at 185-86.) McKinney also reported a bilateral upper extremity tremor, anxiety and headaches. (R. at 186.) Dr. Newell diagnosed history of seizure disorder, inflammatory arthritis with positive antinuclear antibody, myalgias, arthralgias, anxiety and intention tremor. (R. at 188.) Dr. Newell opined that McKinney could stand and walk for up to four hours in an eight-hour workday and that she could sit for

up to six hours in an eight-hour workday. (R. at 188.) Dr. Newell opined that McKinney could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 188.) He indicated that McKinney could occasionally bend, stoop, crouch, reach, handle, feel, grasp and finger. (R. at 188.)

On October 4, 2003, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated McKinney at the request of Disability Determination Services. (R. at 190-97.) McKinney reported that she had undergone counseling in the 1980s for depression and was hospitalized at Woodridge Hospital due to depression, but did not remember when this occurred. (R. at 191.) Lanthorn noted that McKinney displayed a fairly normal affect and mood, was rational, coherent and alert and displayed no evidence of any psychotic process or delusional thinking. (R. at 192.) McKinney reported a normal mood, occasional depression, inconsistent sleep and some fatigue after work. (R. at 192-93.) McKinney also gave a vague report of what Lanthorn opined were panic attacks. (R. at 193.) The Wechsler Adult Intelligence Scale-Third Revision, ("WAIS-III"), test was administered, and McKinney obtained a verbal IQ score of 74, a performance IQ score of 75 and a full-scale IQ score of 72. Due to the low to marginal effort put forth by McKinney, Lanthorn opined that McKinney's true intellectual functioning level actually was within the low average to average range. (R. at 194-95.) Lanthorn diagnosed mixed anxiety-depressive disorder, not otherwise specified, and assigned a Global Assessment of Functioning, ("GAF"), score of 60-65.[4] (R. at 196.) Lanthorn concluded that McKinney may have symptoms

---

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32

of anxiety and depression, but that these were considered mild. (R. at 196.) Lanthorn also opined that McKinney's described panic attacks did not appear to be recurrent, that she may benefit from some counseling, and that her IQ scores were an underrepresentation of her true intellectual functioning level. (R. at 196-97.)

Lanthorn noted no limitations in McKinney's ability to understand or remember locations, work-like procedures or simple and/or detailed instructions. (R. at 196.) Lanthorn did note a possible minor limitation in McKinney's ability to make work-related decisions due to her anxiety and depression, but noted no limitations in her ability to interact socially, to maintain appropriate behavior and to interact appropriately, to adapt or to respond to changes in the work setting and plan and set goals. (R. at 196.)

On November 18, 2003, Dr. Albertine de Wit, M.D., a rheumatologist, evaluated McKinney for possible mixed connective tissue disease. (R. at 198-201.) McKinney reported that her last seizure was in 1997, when she was admitted to the hospital for toxic shock syndrome. (R. at 199.) McKinney reported that she had been depressed and had difficulty functioning. (R. at 200.) Dr. de Wit noted that McKinney had an involuntary tremor in both hands, but was able to walk a straight line without major difficulty. (R. at 200.) X-rays of McKinney's lumbar spine were normal. (R. at 202.) X-rays of McKinney's pelvis and right knee were normal. (R. at 202.) X-rays

---

(American Psychiatric Association 1994). A GAF of 51-60 indicates than an individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational or school functioning. ..." DSM-IV at 32. A GAF of 61-70 indicates "[s]ome mild symptoms...OR some difficulty in social, occupational, or school functioning..., but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

Case 1:06-cv-00012-JPJ-PMS   Document 18   Filed 12/21/06   Page 10 of 18   Pageid#: 86

of McKinney's left knee showed Pellegrini-Stieda.[5] (R. at 202.) Dr. de Wit opined that McKinney suffered from polyarthralgia and myalgia, probable Raynaud's phenomenon, positive antinuclear antibody, grand mal seizures, cephalalgia, a history of toxic shock syndrome, status post cholecystectomy and morbid obesity. (R. at 201.) Dr. de Wit also opined that McKinney may be suffering from drug-induced systemic lupus erythematosus versus a mixed connective tissue disorder or undifferentiated connective tissue disorder. (R. at 201.)

On December 17, 2003, Dr. Donald R. Williams, M.D., a state agency physician, indicated that McKinney had the residual functional capacity to perform light work. (R. at 215-24.) He indicated that McKinney was limited in her ability to push and/or pull with her upper and lower extremities. (R. at 216.) Dr. Williams indicated that McKinney could occasionally climb stairs, balance, stoop, kneel, crouch or crawl, but never climb ladders. (R. at 219.) Dr. Williams also opined that McKinney was limited in her ability for gross and fine manipulation. (R. at 220.) Dr. Williams also opined that McKinney had no visual or communicative limitations. (R. at 220-21.) He found that McKinney was limited in her ability to work around hazards, such as machinery and heights. (R. at 221.) This assessment was affirmed by Dr. Richard M. Surrusco, M.D., another state agency physician, on March 16, 2004. (R. At 224.)

On December 17, 2003, Eugenie Hamilton, Ph.D., a state agency psychologist, indicated that McKinney suffered from a nonsevere anxiety-related disorder. (R. at

---

[5]Pellegrini-Stieda disease is defined as a condition characterized by a semilunar bony formation in the upper portion of the medial lateral ligament of the knee due to traumatism. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 491 (27th ed. 1988).

-11-

225-40.) Hamilton indicated that McKinney had no restriction of her activities of daily living. (R. at 237.) Hamilton indicated that McKinney had mild limitations in her ability to maintain social functioning and to maintain concentration, persistence and pace. (R. at 237.) Hamilton also indicated that McKinney had not experienced any episodes of decompensation. (R. at 237.) This assessment was affirmed by Joseph Leizer, Ph.D., another state agency psychologist, on March 16, 2004. (R. at 225.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age,

education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 11, 2005, the ALJ denied McKinney's claim. (R. at 19-27.) The ALJ found that the medical evidence established that McKinney suffered from severe impairments, namely a seizure disorder and bilateral hand tremor, but he found that McKinney did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23-24, 26.) The ALJ found that McKinney retained the residual functional capacity for light work, which did not require hazardous work around dangerous machinery and unprotected heights. (R. at 26.) The ALJ found that McKinney's impairments would not prevent her from performing her past relevant work as a video store cashier. (R. at 26.) Thus, the ALJ found that McKinney was not disabled under the Act and was not eligible for DIB or SSI benefits. (R. at 26-27.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006).

McKinney argues that the ALJ erred by failing to give greater weight to the opinion of her treating neurologist, Dr. Sisk. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 13-15.) McKinney also argues that the ALJ erred by failing to find that her mental impairments, headaches and obesity were severe. (Plaintiff's Brief at 16-20.) McKinney further argues that the ALJ's finding with regard to her residual functional capacity is not supported by substantial evidence. (Plaintiff's Brief at 20-23.)

-13-

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.927(d), 416.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

McKinney argues that the ALJ erred by failing to give greater weight to the opinion of her treating neurologist, Dr. Sisk. (Plaintiff's Brief at 13-15.) I disagree. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give

-14-

Case 1:06-cv-00012-JPJ-PMS   Document 18   Filed 12/21/06   Page 14 of 18   Pageid#: 90

more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In his opinion, the ALJ stated that he was rejecting Dr. Sisk's opinion because it was inconsistent with his treatment reports, which consistently showed that McKinney's seizure disorder was well-controlled with medications. (R. at 24.) The ALJ further found Dr. Sisk's opinion inconsistent with the findings of Dr. Newell and the state agency physicians. (R. at 24.) The record shows that Dr. Sisk consistently reported that McKinney's seizure disorder was controlled with medications. (R. at 141, 146, 305.) In addition, McKinney consistently reported to her physicians that her seizure disorder was controlled by medication. (R. at 153, 185-86, 199, 337.) While McKinney complained of headaches, she also reported that they were controlled with over-the-counter medication, such as Aleve. (R. at 305.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Furthermore, there is no evidence that any physician placed any limitations on McKinney's work-related abilities as a result of her complaints of headaches. McKinney did not testify that headaches affected her ability to work as a video store clerk. (R. at 339-40.) Based on this, I find that substantial evidence exists to support the ALJ's rejection of Dr. Sisk's opinion.

McKinney also argues that the ALJ erred by failing to find that her mental impairments, headaches and obesity were severe. (Plaintiff's Brief at 16-20.) I disagree. The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2006). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2006). The Fourth Circuit held in *Evans v. Heckler*, that, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (emphasis in original).

Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding that McKinney did not suffer from a severe mental impairment. While Dr. Newell diagnosed anxiety, he placed no limitations on McKinney's work-related abilities as a result of this diagnosis. (R. at 188.) Lanthorn also diagnosed an anxiety disorder, but found that McKinney's symptoms were only mild. (R. at 196.) In addition, the state agency psychologists found that McKinney suffered from a nonsevere anxiety-related disorder and that she had no or only mild limitations as a result. (R. at 225-40.) Furthermore, McKinney testified at her hearing

that she did not get nervous at work because she was used to being around people. (R. at 342.) There is no evidence that McKinney was under the care of a mental health professional. Based on this, I find that the ALJ did not err in finding that McKinney did not suffer from a severe mental impairment.

I also find that substantial evidence exists to support the ALJ's finding that McKinney's headaches and obesity were not severe impairments. As stated above, while McKinney complained of headaches, she also reported that they were controlled with over-the-counter medication, such as Aleve. (R. at 305.) Furthermore, there is no evidence that any physician placed any limitations on McKinney's work-related abilities as a result of her complaints of headaches. McKinney did not testify that headaches affected her ability to work as a video store clerk. (R. at 339-40.) While the physicians of record found that McKinney was obese, they did not place any limitations on her work-related abilities as a result of her obesity. (R. at 144, 146, 153, 201, 304.) In August 2004, Dr. Sisk found that McKinney could not walk in a straight line without wobbling to the side due, in part, to her obesity. (R. at 304.) Dr. Newell and Dr. de Wit reported that McKinney's ability to walk in tandem and straight-away was normal. (R. at 189, 200.) There is no evidence that McKinney required a cane or any other ambulatory device to walk.

McKinney further argues that the ALJ's finding with regard to her residual functional capacity is not supported by substantial evidence. (Plaintiff's Brief at 20-23.) The ALJ found that McKinney retained the residual functional capacity for light work, which did not require hazardous work around dangerous machinery and unprotected heights. (R. at 26.) Dr. Newell and the state agency physicians all found

that McKinney had the residual functional capacity to perform light work. (R. at 188, 215-24.) The limitations as found by the ALJ were posed to the vocational expert, who identified a significant number of jobs that McKinney could perform. (R. at 344-45.) Based on this, I find that substantial evidence exists to support the ALJ's finding that McKinney had the residual functional capacity to perform light work, which did not require hazardous work around dangerous machinery and unprotected heights.

### *IV. Conclusion*

For the foregoing reasons, McKinney's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted, and the commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED: This 21st day of December 2006.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE